Opinion by JUDGE BOORAS
¶ 1 The defendants/appellants/cross-appellees in this case are School District No. 1 and the Board of Education of School District No. 1 in the County of Denver and State of Colorado (collectively, the District). The plaintiff/appellee/cross-appellant is the Denver Classroom Teachers Association (DCTA).
¶ 2 The District appeals a jury verdict finding it liable for breaching several collective bargaining agreements (CBAs) and a determination of damages reflected in the final judgment. DCTA cross-appeals the special interrogatories finding that the District did not breach certain CBAs as they pertained to a particular group of teachers. We affirm.
I. Background
¶ 3 The District and DCTA entered into several CBAs and extensions from 2005 to 2015: the 2005-08 CBA, the 2008-11 CBA, the 2011-12 Extension, and the 2012-15 Extension. The extensions adopted most of the CBA provisions with only a few modifications not pertinent to this action.
¶ 4 From the mid-1990s until the 2006-07 school year, the District compensated teachers for attending English Language Acquisition (ELA) training. ELA is a program to train teachers to work more effectively with students who have limited English language proficiency. A federal consent order requires the District to have teachers who are trained to teach such students. After the 2006-07 school year, the District stopped paying teachers for attending the training, although it offered teachers who had already started the training that year a one-time stipend of $500.
¶ 5 DCTA filed a grievance against the District alleging violations of the 2005-08 CBA. The grievance resulted in nonbinding arbitration. The arbitrator issued a recommendation in favor of DCTA, but the school board elected not to adopt the recommendation.
*684 ¶ 6 DCTA subsequently filed suit for breach of the 2005-08 and 2008-11 CBAs and the extensions, and the trial court bifurcated the liability and damages portions of the trial. A jury returned verdicts in favor of DCTA for breach of contract, but it held the District not liable in special interrogatories regarding breach for teachers in the Professional Compensation (ProComp) system.
II. Analysis
¶ 7 The District raises three contentions. First, it contends that the CBAs unambiguously do not require extra compensation for ELA training. Next, it asserts that additional evidence pertaining to the CBAs and extensions from 2008 forward shows that the District was not required to compensate teachers for ELA training. Finally, the District contends the trial court erred in failing to limit damages because (1) some of DCTA's damages accrued beyond the statute of limitations and (2) DCTA did not exhaust its administrative remedies for the CBAs and extensions subsequent to 2008.
¶ 8 DCTA cross-appeals, alleging the trial court erred in giving the jury special interrogatories asking it to determine whether teachers in the ProComp system were exempted from the entitlement to extra pay for ELA training.
¶ 9 We address each contention in turn.
III. Legal Principles of Contract Interpretation
¶ 10 Most of the issues raised by the parties involve interpretation of the CBAs. The interpretation of a contract is a question of law that we review de novo. Fed. Deposit Ins. Corp. v. Fisher , 2013 CO 5, ¶ 9, 292 P.3d 934. In determining whether a contractual provision is ambiguous, we examine the language of the contract and construe it in harmony with the plain and generally accepted meaning of the words used. Dorman v. Petrol Aspen, Inc. , 914 P.2d 909, 912 (Colo. 1996).
¶ 11 A provision is ambiguous "if it is fairly susceptible to more than one interpretation." Id. (quoting Fibreglas Fabricators, Inc. v. Kylberg , 799 P.2d 371, 374 (Colo. 1990) ). We may consider extraneous evidence to determine whether a contract is ambiguous. Cheyenne Mountain Sch. Dist. No. 12 v. Thompson , 861 P.2d 711, 715 (Colo. 1993).
¶ 12 If a contract is unambiguous, it cannot be changed by extrinsic evidence. Dorman , 914 P.2d at 911. If it is ambiguous, it must be construed in accordance with the intent of the parties, and we may consider extraneous evidence to determine such intent. Id. at 911-12. Once a contract is determined to be ambiguous, its interpretation becomes an issue of fact. Id.
IV. The CBAs Are Ambiguous Regarding Compensation for ELA Training
¶ 13 The District contends that the CBAs and extensions are unambiguous in their construction and that they do not require the district to pay teachers for ELA training. We do not agree.
¶ 14 The relevant articles of the 2005-08 and 2008-11 CBAs are:
2-7: The parties recognize that the Board has the responsibility and authority to establish policies and regulations for the management of all the operations and activities of the District. All lawful rights and authority of the Board not modified by this Agreement are retained by the Board .
8-1: The contract year shall be one hundred eighty-one (181) days.[1]
8-2: The work week shall be forty (40) hours....
8-1-3: There is an expectation that teachers will attend beyond the contract year for professional development determined by the principal if:
e. teachers attending are paid in accordance with Article 32,
13-2: In order to be considered for a position, a teacher must ... meet all posted requirements for the position....
32-1: In accordance with the provisions for work week and work year found in Articles 8-1 and 8-2, any time a teacher agrees to *685 perform work for the District beyond the work week or work year, that teacher will be compensated as described in this Article.
32-2: Hourly and Daily Rates ... In-Service Education $19.60/hr.[2]
(Emphasis added.)
¶ 15 The District relies on article 2-7, a management rights clause, to support its contention that it retained the right to refuse to pay teachers for ELA training if the contract does not specifically require it. It further contends that because article 13-2 does not specifically require the District to pay teachers for fulfilling a posted job requirement, and because ELA training was a posted job requirement, the District retains the right to refuse pay for ELA training.
¶ 16 The District's assertion fails to consider articles 8-1, 8-2, and 32-1. Articles 8-1 and 8-2 clearly define the number of hours per week and days per year a teacher is required to work, and article 32-1 provides that any time a teacher agrees to perform work beyond the set number, "that teacher will be compensated ." (Emphasis added.) The articles are silent on whether work beyond that number includes training required to fulfill a job requirement, even those requirements posted in the job description.
¶ 17 Because the articles provide for payment for work beyond the forty-hour week, and because the ELA training may fall into that category, the contract is fairly susceptible to being interpreted to require payment for such work. We conclude that the CBAs are ambiguous and the trial court properly let the interpretation go to the jury as a question of fact.
¶ 18 Relying on City & County of Denver v. Denver Firefighters Local No. 858 , 2014 CO 15, ¶ 18, 320 P.3d 354, the District argues that when an agreement contains a management rights clause, the managing entity retains expansive rights. The District's reliance on Denver Firefighters is misplaced, however, because in that case the supreme court determined that the CBA in question unambiguously gave the city the right to draft and implement the disputed terms. Id. at ¶ 11. Here, in contrast, we have concluded that the CBAs are ambiguous regarding payment for ELA training. Therefore, although management rights clauses provide expansive rights under certain circumstances, those circumstances are not present in this case.
V. The CBAs From 2008 Forward Do Not Preclude Extra Compensation for ELA Training
¶ 19 The District contends that additional evidence-pertaining to the CBAs and extensions beginning in 2008-shows unambiguously that it was not required to compensate teachers for ELA training beyond that year. It raises two assertions to support this point: (1) ELA training was a "special condition of employment" under the teacher contract and (2) the parties' bargaining history indicates that any requirement to compensate teachers for ELA training was purposely excluded from the CBAs.
A. Special Condition
¶ 20 Under article 8-1-5 of the CBAs:
Any special conditions regarding the assignment of any teacher will be reduced to writing and become an addendum to the individual's initial employment contract with the District.
¶ 21 The teachers' individual contracts stated in relevant part:
If the teacher is assigned at the time of hire or thereafter to teach within the ELA-S/ELA-E program, in addition to the other provisions of this Contract, this Contract is further conditioned upon the teacher's fulfillment of the following, on a timeline proscribed [sic] by the District: (a) the teacher's successful completion at their sole cost and expense , except to the extent tuition is subsidized at the District's sole discretion, of the current ELA Professional Development Units.
(Emphasis added.)
¶ 22 The District contends that, when read together, these provisions show that teachers, *686 not the District, were responsible for paying for ELA training.
¶ 23 DCTA argues that the District waived this argument by failing to raise it before the trial court. We note that although the District did not cite to an appropriate portion of the record in its opening brief, it raised this issue several times during trial proceedings and thus sufficiently preserved the argument.
¶ 24 The portion of the teachers' contracts that included the ELA training was not, as the District asserts, a "special condition" relating to employment, nor was it memorialized in an "addendum." Webster's Third International Dictionary 2186 (2002) defines "special" as "distinguished by some unusual quality," and "relating to a single thing or class of things." Black's Law Dictionary 1612 (10th ed. 2014) defines it similarly as "[o]f, relating to, or designating a species, kind, or individual thing ... designed for a particular purpose ... unusual; extraordinary."
¶ 25 Here, the provision regarding ELA training was in every new contract starting in 2011. The language was not incorporated as an addendum-"[s]omething to be added, usu. to a document; esp., a supplement," id. at 45-but was incorporated as number 14 out of 20 sections in each contract. The District's interpretation would allow it to avoid any provision of the CBAs by adding language to the teachers' individual contracts and calling it a special condition.
¶ 26 The District claims that "it is undisputed that completing the ELA Training if a teacher is not otherwise 'fully qualified' under the Consent Decree was a 'special condition regarding the assignment' of teachers." The District does not, however, cite to any portion of the record to support this contention.
¶ 27 The CBAs do not define "special condition," and, even in light of additional evidence, the CBAs are ambiguous regarding whether ELA training is a "special condition" regarding assignment of the teacher. The trial court, therefore, properly gave the issue to the jury.
B. Bargaining History
¶ 28 The District contends that because DCTA knew the District was no longer paying teachers for ELA training and failed to specifically incorporate pay into subsequent CBAs, DCTA acquiesced to the practice and the CBAs should be construed accordingly. We do not agree.
¶ 29 The District relies on Salazar v. Butterball , 644 F.3d 1130, 1142 (10th Cir. 2011), for the proposition that when a party fails to negotiate over a pre-existing practice of nonpayment, the party acquiesces to such practice. Here, however, DCTA's position was that the CBAs, as already written, entitled teachers to receive pay for ELA training. Unlike the practice of nonpayment in Butterball -in which it was undisputed that Butterball had never paid employees for a particular activity-DCTA's position was supported by the District's practice until 2008 of paying teachers for ELA training. Id. at 1141. Therefore, there was no need for DCTA to bargain for changes in the CBAs. This position was also supported by the decision of the nonbinding arbitrator, who ruled, in October 2008, that the District had in fact violated the terms of the 2005-08 CBA.
¶ 30 Additionally, the District cites numerous persuasive authorities for the proposition that when a party attempts, but fails, to negotiate for a particular provision, such a provision should not be read into the contract. Those authorities are distinguishable, however, and DCTA asserts just as effectually that the onus was on the District to negotiate for a provision not to pay teachers for ELA training, and that the past practice of payment for ELA training under identical CBAs evidenced the true meaning of the agreements.
¶ 31 Accordingly, the District's contentions are not persuasive as to the ultimate question of whether the CBAs specifically gave the District the authority to refuse pay for ELA training, and the trial court correctly gave that question to the jury for a factual determination.
*687 VI. Statute of Limitations
¶ 32 The District asserts that the trial court erred in not precluding recovery of damages that accrued before October 24, 2007-six years before the case was filed. We do not agree.
¶ 33 We review the trial court's legal conclusions de novo and its factual findings for clear error. Williams v. Crop Prod. Servs., Inc. , 2015 COA 64, ¶ 4, 361 P.3d 1075. The date of accrual of a claim is generally a question of fact, but if the undisputed facts clearly establish the date, the issue may be decided as a matter of law. Id. In Colorado, the statute of limitations for breaching a CBA is six years. § 13-80-103.5, C.R.S. 2016; Carpenters & Millwrights Health Benefit Tr. Fund v. Domestic Insulation Co. , 387 F.Supp. 144, 148 (D. Colo. 1975).
¶ 34 The District stopped paying teachers for ELA training starting with the 2007-08 school year, which began August 13, 2007. DCTA filed its complaint on October 24, 2013. The District contends that the trial court erroneously awarded damages that occurred between August 13 and October 24, 2007, and should have been barred by the statute of limitations.
¶ 35 Although teachers may have begun ELA training before October 24, 2007, there is no evidence in the record of individual classes attended or any payment that was due before the end of the fall semester. There is no evidence of an actionable injury, therefore, until the end of the Fall 2007 semester. Thus we perceive no error in the trial court's decision to award damages for the complete Fall 2007 semester.
VII. Failure to Exhaust Administrative Remedies
¶ 36 Finally, the District contends that DCTA should have been barred from any relief for the 2008-09 school year and beyond because it failed to exhaust administrative remedies for those years. DCTA filed a grievance only for the 2007-08 school year, which was under the 2005-08 CBA.
¶ 37 Exhaustion of remedies is a jurisdictional question. Thomas v. Fed. Deposit Ins. Corp. , 255 P.3d 1073, 1077 (Colo. 2011). An employee must exhaust an available administrative process before filing a breach of contract claim. Jefferson Cty. Sch. Dist. No. R-1 v. Shorey , 826 P.2d 830, 844 (Colo. 1992). We review a trial court's factual determinations for clear error and its legal conclusions de novo. Brown v. Jefferson Cty. Sch. Dist. No. R - 1 , 2012 COA 98, ¶ 9, 297 P.3d 976.
¶ 38 The doctrine of exhaustion of remedies does not apply if it is clear beyond a reasonable doubt that further pursuit of relief would be futile. Thomas , 255 P.3d at 1077. In this case, the trial court made factual findings that DCTA's original grievance led to a nonbinding arbitration decision in its favor, the District rejected that decision, the language of subsequent CBAs did not change, and the practices and parties remained the same.
¶ 39 The District asserts that DCTA was required to file a new grievance for each CBA because the arbitrator may have been different and the members of the school board would have been new. The District also points to numerous facts that would have been different under a new grievance such as different ELA training requirements, the choice of a stipend, and the credit offered for taking ELA training.
¶ 40 Throughout the course of this litigation, however, the District maintained-and still maintains-that none of the CBAs require extra pay for ELA training, despite the supposed changes in circumstances. Furthermore, when presented with the final result of the administrative remedies process, the school board rejected the arbitrator's recommendation. At any point, the board could have decided to pay teachers for ELA training, but it did not.
¶ 41 We therefore affirm the trial court's finding that further efforts by DCTA to achieve payment for ELA training through administrative remedies would have been futile.
*688 VIII. ProComp Agreements
¶ 42 DCTA, in its cross-appeal, contends that the trial court erred in giving the jury special interrogatories to decide whether teachers under the ProComp system were exempt from receiving extra pay for ELA training. We affirm.[3]
¶ 43 We review a trial court's decision to give a jury instruction for an abuse of discretion. Bedor v. Johnson , 2013 CO 4, ¶ 8, 292 P.3d 924. A court abuses its discretion if there is no competent evidence to support the instruction. Id. at ¶ 9.
¶ 44 The trial court gave the jury special interrogatories asking it to determine whether, for each year, teachers under the ProComp agreement were exempt from receiving extra pay for ELA training. The court relied on the following sections of the ProComp agreement:
7.3.1.5 Teachers who complete Professional Development Units in connection with paid district in service shall receive both hourly pay for attending the in[-]service as provided for by the Master Agreement and for base building incentives for completing Professional Development Units as long as their activities meet the criteria for the DPS/DCTA Professional Development Protocol.
7.3.1.6 Teachers who complete district required coursework as part of required district in-service, such as the teacher induction program, teacher in residence program, training for the Literacy Program or training for the English Language Acquisition program, may count their service in those programs toward Professional Development Units as long as their activities meet the criteria for the DPS/DCTA Professional Development Protocol.
(Emphasis added.)
¶ 45 The District argued at trial that the inclusion of ELA courses in section 7.3.1.6 necessarily precluded the courses from being a paid in-service program under section 7.3.1.5. DCTA asserts, and we agree, that section 7.3.1.6 does not specifically state that the programs listed are unpaid. We disagree, however, that the two sections, when read together, along with supporting testimony at trial, do not provide some competent evidence that had the ProComp agreement intended to include ELA as a paid in-service program it would have included it in section 7.3.1.5 or elsewhere in the CBAs.
¶ 46 The presence of ELA training in section 7.3.1.6 coupled with its absence in section 7.3.1.5 could reasonably lead to the conclusion that it was not a paid in-service, and that teachers who agreed to the ProComp system were therefore not entitled to such payment.
¶ 47 Because competent evidence supported the assertion, we conclude that the trial court did not abuse its discretion in allowing the jury to determine whether teachers under the ProComp agreement forfeited their entitlement to compensation for ELA training.
IX. Conclusion
¶ 48 For the foregoing reasons, we affirm the final judgment.
JUDGE TERRY and JUDGE BERGER concur.

Later CBAs changed the number of days to 184, but this change does not affect our analysis.

The article number and dollar amount changed in the later CBAs, but again, this does not affect our analysis.

The District argues that DCTA invited any error regarding the jury instructions. We need not determine whether DCTA preserved its argument because we conclude that the trial court did not err.